# IN RE: TUTU WATER WELLS CONTAMINATION LITIGATION
## RHODA J. HARTHMAN, et al., Plaintiffs

### v.

### TEXACO INC., et al, Defendants

Master Docket File Docket No. 1989-107

Civ. No. 1989-220

District Court of the Virgin Islands

Div. of St. Thomas and St. John

April 19, 1996

RICHARD R. KNOEPFEL, ESQ., (BRIGGS, KNOEPFEL & RONCA), Charlotte Amalie, St. Thomas, U.S.V.I. and THOMAS H. HART, III, ESQ., (ALKON, RHEA & HART), Christiansted, St. Croix, U.S.V.I., *for Plaintiff PID-Harthmans*

JOHN K. DEMA, ESQ., CAREY-ANNE MOODY, ESQ., (LAW OFFICES OF JOHN K. DEMA, P.C.), Christiansted, St. Croix, U.S. V.I. and DARREN DEFOE, ESQ., Waterford, Maine, *for Plaintiff Four Winds Plaza Partnership*

ADDISON J. MEYERS, ESQ., MARY HOERBER, ESQ., (LAW OFFICES OF O'CONNOR & LEMOS), Coral Gables, Florida and EDGAR CHRISTENSEN, ESQ., (LAW OFFICES OF R. ERIC MOORE), Christiansted, St. Croix, U.S.V.I., *for Defendant Texaco, Inc., Texaco Caribbean, Inc.*

ROBERT T. LEHMAN, ESQUIRE, DEBRA ROSEN, ESQ., WILLIAM J. O'KANE, ESQ., CHRISTOPHER GIBSON, ESQ., (ARCHER & GREINER, HADDONFIELD), New Jersey and DOUGLAS L. CAPDEVILLE, ESQ., Christiansted, St. Croix VI, *for Defendants Esso Standard Oil, S.A., Ltd., Esso Virgin Islands, Inc., and Esso Standard Oil, Co. (P.R.)*

RICHARD E. DALEY, ESQ., (LAW OFFICES OF PATTIE & DALEY), Christiansted, St. Croix, U.S.V.I. and TERRI JACOBSEN, ESQ., (MORGAN, LEWIS & BOCKIUS), Miami, Florida and EDWARD S.G. DENNIS, JR., ESQ., KELL

DAMSGAARD, ESQ., (MORGAN, LEWIS & BOCKIUS), Philadelphia, PA, *for Exxon Corporation*

ROBERT N. DE LUCA, ESQ., (SAUL, EWING, REMICK & SAUL), Philadelphia, Pennsylvania, *for Ana Gloria Ramos & Otto Bustelo, Esq.*

JOHN A. ZEBEDEE, ESQ., (LAW OFFICES OF JAMES L. HYMES), Charlotte Amalie, St. Thomas, U.S.V.I., *for Vernon Morgan*

FRANCIS E. JACKSON, JR., ESQ., Charlotte Amalie, St. Thomas, U.S. Virgin Islands, *for Daniel Bayard*

CAROL ANN RICH, ESQ., (CAMPBELL, ARELLANO & RICH), Charlotte Amalie, St. Thomas, U.S.V.I., *for Ramsay Motors, Inc.*

NANCY D'ANNA, ESQ., Cruz Bay, St. John, U.S.V.I., and PATRICIA MARTINEZ LORENZO, ESQ., Hato Rey, Puerto Rico, *for L'Henri, Inc.*

MYRON J. BROMBERG, ESQ., JOHN M. NEWMAN, ESQ., DIANE SIANA, ESQ., (PORZIO, BROMBERG & NEWMAN), Morristown, New Jersey and MARC Z. EDELL, ESQ., (EDELL & ASSOCIATES), Morristown, New Jersey and KEVIN A. RAMES, ESQ., Christiansted, St. Croix, U.S.V.I., *for Paul Lazare, Andreas Gal, The Duplan Corporation, Laga Industries, Ltd., Panex Industries, Inc., and Panex Co.*

JOHN R. COON, ESQ., (LAW OFFICE OF JOHN R. COON), St. Croix, U.S. Virgin Islands, *for Western Auto*

RALDA V. SIMMONDS, ESQ., Charlotte Amalie, St. Thomas, U.S. Virgin Islands, *for Virgin Islands Housing Authority*

GEORGE MARSHALL MILLER, ESQ., Charlotte Amalie, St. Thomas, U.S. Virgin Islands, *for Thomas A. Gassett, G.S. Industries, Inc.*

JULIO BRADY, ESQ., Attorney General for the Virgin Islands, By: HENRY THOMAS, Assistant Attorney General, Virgin Islands Department of Justice, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, *for V.I. Department of Education*

KATHERINE E. HARSCH, ESQ., (BORNN, BORNN, HANDY & RASHID), Charlotte Amalie, St. Thomas, U.S.V.I., *for Siegfried Torinus and Waltrad Torinus*

DANIEL RIESEL, ESQ., (SIVE, PAGET & RIESEL, P.C.), New York, New York and VINCENT J. APRUZZESE, ESQ., (APRUZZESE, MCDERMOTT, MASTRO &

Murphy), Liberty Corner, New Jersey and EDWARD H. JACOBS, ESQ., (JACOBS & BRADY), Christiansted, St. Croix, U.S.V.I., *for Law Firm of Goldman Antonetti Cordova & Axtmayer, Jose Cepeda, Esq. and Francis Torres, Esq.*

JOEL H. HOLT, ESQ., Christiansted, St. Croix, U.S.V.I., *for Eugenio C. Romero, Esq.*

BRITAIN H. BRYANT, ESQ., (BRYANT, WHITE & ASSOCIATES, PC), Christiansted, St. Croix, U.S.V.I., *for Warren B. Cole, Esq.*

BROTMAN, *Senior District Judge*

## OPINION

This opinion is the last of three opinions concerning the imposition of sanctions against the Esso Defendants[1] and their former counsel.[2] During the past twenty years as a United States District Judge, I cannot recall being involved with a more disturbing proceeding. The process of determining whether and if so, what type of sanctions should be imposed on a party or their counsel while passing on the merits of the underlying action places a trial judge in a difficult, unfamiliar role. Having previously identified the scope of the sanctionable conduct that has occurred in this matter, I have endeavored to fashion the appropriate form and extent of sanctions. In considering the submissions of the parties and canvassing the often contradictory literature on sanctions, I have decided to travel a novel path in my approach to the imposition of sanctions in this case. The purpose in doing so is twofold: to deter future parties from engaging in the type of sanctionable conduct present here and to impose a sanction which would result in a positive benefit to the Virgin Islands.

### I. Factual and Procedural Background

In the first sanction related opinion, *In Re Tutu Wells Contamination Litigation*, 162 F.R.D. 46 (D.V.I. 1995) ("*Tutu I*"), this court set

---

[1] The "Esso Defendants" are Esso Standard Oil S.A. Ltd., Esso Virgin Islands, Inc. and Esso Standard Oil Co. (Puerto Rico).

[2] The term "former counsel" refers to Eugenio Romero, Esquire ("Romero"), Jose Cepeda, Esquire ("Cepeda") and Francis Torres, Esquire ("Torres") individually and their firm of Goldman Antonetti Cordova & Axtmayer ("Goldman Antonetti"). Some time after the onset of the sanction proceedings, Romero left the Goldman Antonetti firm.

forth the factual background upon which it found that sanctions should be imposed against the Esso Defendants and their former counsel. Although that opinion outlined various possibilities for the specific sanctions under consideration at that time, the court decided to allow the parties an opportunity to "settle" — as one part of the forthcoming sanctions — any monetary claims asserted by the various parties moving for sanctions (collectively, the "Movants").[3]

While these settlement discussions were proceeding, both the Esso Defendants and their former attorneys moved this court to reconsider, clarify and/or modify its original sanction opinion. Although it reiterated its earlier finding that sanctions were warranted against these parties, the court again refrained from specifically delineating the form and extent of such sanctions. *See, In Re Tutu Wells Contamination Litigation*, 162 F.R.D. 81 (D.V.I. 1995) (*"Tutu II"*). Instead, the court issued an Order to Show Cause why, in light of the court's factual findings, monetary and nonmonetary sanctions should not issue against the Esso Defendants and their former counsel. *Id.* at 91. In response to that Order, the parties submitted voluminous briefs to this court which then conducted two days of hearings in November 1995 (the "November hearings"). The sole issue before this court is the nature and extent, if any, of sanctions that should be imposed against the Esso Defendants and their former counsel.

## II. Analysis

The court finds that sanctions against the Esso Defendants and their former counsel are warranted. Further, having reviewed the arguments presented by all parties as well as this court's previous opinions in these proceedings, *severe* sanctions are warranted because both the parties and the entire St. Thomas community

---

[3] The term "Movants" as used throughout this opinion refers collectively to the following parties: PID/Harthmans, Four Winds Plaza Partnership, Vernon Morgan, Texaco (including both Texaco, Inc., and Texaco Caribbean, Inc.), Ramsay Motors, Inc., L'Henri, Inc., the Laga Defendants (including Paul Lazare, Andreas Gal, The Duplan Corporation, Laga Industries, Ltd., Panex Industries, Inc., and Panex Company) and Western Auto Supply Company. In addition to these parties, the Virgin Islands Housing Authority and the Virgin Islands Department of Education joined in calling for sanctions but have abandoned any claims for monetary sanctions.

have suffered as a result of the sanctionable conduct. Among the Esso Defendants and their former counsel, the form and severity of the monetary sanctions will vary according to such factors as their individual levels of responsibility, their financial ability to pay a sanction and the impact of their conduct on the Movants and surrounding community. Specifically, the court will impose two types of monetary sanctions: a payment to each eligible Movant for its participation in the sanction proceedings and a payment into court of a substantial sum of money for the purpose of funding a community service project benefitting the entire St. Thomas community. In addition, nonmonetary sanctions will be assessed, but only against the individual attorneys, Romero, Cepeda and Torres.

A. **Pursuant to this court's Order to Show Cause, the issue presently before this court is whether the Esso Defendants and their former counsel have met their burden of showing that sanctions should not be imposed against them.**

Despite the court's clear delineation of the issue to be addressed at the November hearing, the parties have dramatically mischaracterized the issue both in their submissions to the court as well as their presentation at the hearing. Ironically, this mischaracterization and the additional burden it placed upon the court appear to stem from the court's efforts to afford the Esso Defendants and their former counsel the opportunity to settle the monetary claims of the Movants. In *Tutu I*, the court ordered that the Esso Defendants and their former counsel would have the opportunity to negotiate with the Movants to attempt to resolve certain claims for monetary sanctions in this matter. *Tutu I*, 162 F.R.D. at 80-81. This approach was adopted for two reasons. First, the court has consistently taken the position that any monetary sanctions awarded *in favor of any Movant* should be in proportion to the prejudice suffered by that Movant as a result of the sanctionable conduct. *Tutu II*, 162 F.R.D. at 90-91; Transcript of Sanction Hearings dated June 26, 1995 at 62 ("June Transcript"); Transcript of Sanction Hearings dated November 7, 1996 at 9 ("November Transcript"). Albeit novel, such negotiations could have resulted in a more optimal level of monetary sanctions, because in contrast to the court, the parties are better able to

evaluate the relative merits of the monetary claims. Second, to the extent that any of the parties would agree to settle their monetary sanction claims, scarce judicial resources would have been preserved for expediting the conclusion of this matter.

Perhaps because of its novelty, this process largely failed.[4] Several of the Movants apparently took the position that they were required simply to submit their monetary claims to the Esso Defendants and their former counsel for complete reimbursement. When those parties refused these requests, the Movants submitted their claims to the court apparently under the impression that the court would award their outstanding requests after the November hearing. In contrast, the Esso Defendants and their former counsel apparently approached the opportunity to negotiate these claims with the view that they would "settle" only those claims in which they found that a Movant had suffered substantial prejudice as a result of the sanctionable conduct. Consistent with this approach, the Esso Defendants and their former counsel apparently conducted an aggressive, line-by-line review of each Movant's submissions. Because the parties approached the negotiations from such diametrically opposed positions, they settled few of the monetary claims but obviously expended considerable time in deciding *not* to settle them.[5]

---

[4] The court intended for the parties to enter into releases which would allocate the risk of the court awarding monetary sanctions to the Movants. For example, the Esso Defendants and their former counsel could have agreed to pay $ 100,000 to a Movant in exchange for a release of its monetary sanction claims against them. If this court later awarded monetary sanctions to that Movant in excess of $ 100,000, the terms of the release would bar further recovery. Contrary to the approach adopted by the parties, in which each alleged cost was placed under exacting scrutiny, the approach outlined here should have provided an efficient method of reaching a global settlement of the monetary claims. Through this mechanism, the court envisioned that the parties would be able to identify and critically evaluate the risk attendant to the claims for monetary sanctions — that is, the strength of each Movant's claims of prejudice.

[5] As outlined in footnote 11 of this opinion, the Esso Defendants made payments on behalf of themselves and their former counsel to four Movants: Ramsay, L'Henri, PID/ Harthman and Vernon Morgan. The Esso Defendants made no payments to Four Winds, the Laga Defendants or Western Auto because they claimed that these parties released their monetary claims as a result of a global settlement of the common law claims among these parties. In an opinion and order dated February 15, 1996, the court agreed with the Esso Defendants interpretation of that settlement agreement. However, that agreement did not release the claims of these parties against either Goldman Antonetti or their counsellors.

Not only did the negotiations fail, but the process adversely impacted the November hearings. In *Tutu II* after declining to reconsider its prior opinion in this matter, this court entered an Order against the Esso Defendants and their former counsel to show cause why monetary and/or nonmonetary sanctions should not be entered against them. *Tutu II*, 162 F.R.D. at 91. In doing so, the court placed the burden on those parties to show the extent to which sanctions were unwarranted in light of the court's factual findings. Shortly after this court issued *Tutu II*, it scheduled a hearing in June 1995 (the "June hearing") with all counsel to discuss the pending Order to Show Cause hearing set for the following November. At the June hearing, the court indicated that any Movant seeking to have the court impose monetary sanctions against the Esso Defendants in favor of that Movant would be required to brief the extent of prejudice suffered by that Movant as a result of the sanctionable conduct in time for the November hearing. June Transcript at 62.

Armed with the Movants' requests for sanctions, the Esso Defendants and their former counsel have consistently mischaracterized the issue presently before this court as placing the burden of proof on the Movants. Specifically, the Esso Defendants and their former counsel contend incorrectly that the issue before the court is whether the Movants' requests fail to show prejudice thereby precluding the court from awarding any further monetary or nonmonetary sanctions. *See,* Esso's Memorandum in Response to Order to Show Cause Why Sanctions Should Not be Assessed at 6 ("Esso Memorandum"); Esso's Reply to Various Responses To Order to Show Cause at 4 ("Esso had argued vigorously in the wake of [*Tutu I*] that this Court must entertain evidence of prejudice. This court agreed with that contention in its [*Tutu II*] insofar as prejudice may determine the extent of *any* sanction.") (emphasis added) ("Esso Reply"); Memorandum of Law of Respondents Goldman Antonetti & Cordova, Francis Torres and Jose Cepeda in Opposition to Movants' Application for Sanctions at 12-16 (arguing that *Movants'* have not demonstrated the materiality of the Agrelot memorandum in that they have suffered prejudice) (emphasis added) ("Goldman Antonetti Memorandum").

The court has stated consistently that the issue presently before this court is the scope of sanctions which should be imposed on the Esso Defendants and their former counsel. As counsel for the Esso Defendants conceded at the November hearings, November Transcript at 28, the court has held that the scope of any sanctions would depend upon the **"degree of prejudice *or* the severity of the misconduct."** *Tutu II*, 162 F.R.D. at 90 (emphasis added). By requiring the Movants to brief that issue of prejudice, the court did not suggest that monetary or other sanctions would not be imposed even if the Movants failed to show prejudice. Rather, the court intended to evaluate the Movants' claims of prejudice to determine whether and to what extent the court should award monetary or other sanctions in favor of the Movants to compensate them for that prejudice. *Tutu II*, 162 F.R.D. at 90-91. By issuing the Order to Show Cause, the court unmistakably placed the burden on the Esso Defendants and their former counsel to show the court why sanctions should not issue. As stated in *Tutu I*, the "purposeful and deliberate concealment of evidence" by the Esso Defendants and their former counsel raises a presumption that the Movants were prejudiced. *Tutu I*, 162 F.R.D. at 74. The Esso Defendants and their former counsel can overcome that presumption only by the presentation of "clear and convincing evidence that the withheld material was immaterial." *Id.* In clarifying that earlier opinion, the court stated unequivocally that it need not find prejudice in order to impose monetary sanctions against the Esso Defendants and their former counsel. *Tutu II*, 162 F.R.D. at 12. At the June hearing after indicating that the Movants would be required to brief the issue of prejudice, the court reiterated that the Esso Defendants and their former counsel would bear the ultimate burden of showing why sanctions should not be entered against them. June Transcript at 74.[6] Thus, even if the Esso Defendants could overcome the presumption, additional sanctions may follow.

---

[6]Specifically, at the June hearing, attorney Dema asked whether, in light of earlier comments made at that hearing, the court still intended for the Esso Defendants and their former counsel to "go forward and tell [the court] why they should not pay monetary sanctions and why their claims should not be dismissed." June Transcript at 74. Confirming that the court had not intended to suggest a change in the burdens to be born at the pending hearing, the court responded affirmatively to Dema's by stating that it was "not deviating at all." *Id.*

## B. The Esso Defendants and their former counsel have failed to show cause why sanctions should not be entered against them.

Having reviewed the arguments presented at the November hearing and the voluminous submissions of the parties, the court finds that the Esso Defendants and their former counsel have failed to show that sanctions should not be imposed against them. Not only have they failed to rebut the presumption that their conduct prejudiced the Movants, but the severity of their sanctionable conduct requires this court to impose demanding sanctions. In doing so, the court will rely solely on its inherent power because neither the applicable statutes nor the Federal Rules of Civil Procedure are "up to the task" of sanctioning these parties. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991). Further, where as here, a trial court has found that the sanctionable parties have engaged in bad faith practices, the trial court need not resort to the Rules and statutes before invoking its inherent power. *Id.* at 51.

With respect to the extent of prejudice suffered by the Movants, the Esso Defendants and their former counsel have failed to rebut the presumption that their conduct prejudiced these parties. At the outset, it should be noted that the Esso Defendants acknowledged that their conduct prejudiced the Movants when they agreed to pay certain Movants some of their costs incurred for their involvement in the sanction proceedings. *See,* Esso Memorandum at 4. However, the extent of prejudice spreads further than simply the costs of participating in these proceedings. In response to the Order to Show Cause, the Esso Defendants and their former counsel address "only the delayed disclosure of the Agrelot memorandum." Esso's Memorandum at 1; Esso's Response to the Movants' Monetary Sanction Claim at 1-6 (focusing on prejudice to the Movants by nondisclosure of the Agrelot memorandum); Goldman Antonetti Memorandum at 1-16. In doing so, these parties are no doubt attempting to minimize, if not avoid, that sanctionable conduct which preceded the nondisclosure of the Agrelot memorandum and the current sanctions proceedings. *See,* *Tutu I,* 162 F.R.D. at 51-53. As outlined in the following section of this opinion, however, the severity of the sanction to be imposed

must take into account not only the Agrelot memorandum but all of the surrounding conduct of these parties. By failing to address the Agrelot memorandum in the context of such conduct, the Esso Defendants and their former counsel could never meet their burden of rebutting the presumption of prejudice suffered by the Movants. *Tutu I*, 162 F.R.D. at 74.

■ ■ Even if the court were to adopt the narrow approach advanced by the Esso Defendants and their former counsel, the nondisclosure of the Agrelot memorandum alone warrants the imposition of sanctions because, at a minimum, it resulted in prejudice to the Movants. With respect to the Agrelot memorandum, the Movants claim that the nondisclosure resulted in severe prejudice, both economic and otherwise, to them in the preparation of their respective cases. In response, the Esso Defendants offer the testimony of an environmental expert, Dr. Robert H. Harris, who opines that the delay in producing the Agrelot memorandum did not compromise the Environmental Protection Agency's (the "EPA") investigation and did not diminish the reliability or credibility of the studies underlying the EPA's findings. Affidavit of Dr. Robert H. Harris at ¶ 34 (the "Harris Affidavit"). Further, he opines that the various Movants have not suffered any substantial prejudice in developing their case as a result of the nondisclosure of the Agrelot memorandum. Harris Affidavit at ¶¶ 41-45. However, Dr. Harris' testimony is deficient in one major respect — it is entirely conjectural. Albeit imperfect, the process of litigation is an art and therefore not amenable to hindsight. Quite simply, no one — not this court nor Dr. Harris — will never be able to identify the myriad of ways in which the nondisclosure adversely impacted this litigation. In recognition of this shortcoming, the Federal Rules of Civil Procedure as well as decisional law impose sanctions in an effort to deter parties from failing to fully disclose relevant information, whether or not material. Where such conduct occurs, absent a showing that the document was completely immaterial to the litigation strategy, sanctions should be imposed on the offending party. *See, Tutu I*, 162 F.R.D. at 74. Applying this standard to the Agrelot memorandum, the court finds both that the substance of the memorandum and

the timing of its disclosure were material to this case;[7] thus, sanctions should follow.

██ ██ In addition to the prejudice suffered by the Movants, severe sanctions are warranted in light of the egregious nature of the sanctionable conduct engaged in by the Esso Defendants and their former counsel. Arguably, each act or omission of sanctionable conduct does not, in isolation, appear to warrant harsh sanctions. No doubt recognizing this reality, both the Esso Defendants and their former counsel have presented incredibly voluminous, factually specific submissions to this court. As outlined previously in this opinion, these submissions often focused solely on the Agrelot memorandum while ignoring other incidents of misconduct which actually gave rise to these sanction proceedings in the first place. In rising above the detail-intensive approach advanced by these parties, however, what becomes clear is that the Esso Defendants and their former counsel systematically flouted their obligations to our system of justice to gain an advantage in this litigation. Whether couched as litigation strategy or as a business decision, such conduct will not be tolerated where, as here, the harm from such an approach reaches beyond the parties to the litigation and beyond the court system itself to threaten the surrounding community. In environmental cases, particularly those concerning a community's water supply, the failure to timely disclose scientific data not only prolongs the inability of the community to use and enjoy their resource unencumbered but can

---

[7] No party to sanction proceedings have argued that the Agrelot memorandum is "immaterial" to the underlying merits of this action. As a part of the science of this case, the Agrelot memorandum is one of the most critical pieces of information sought throughout the discovery process, even if the contents of the memorandum enlighten its readers only slightly. In fact, Dr. Harris' affidavit clearly shows the serious impact that the nondisclosure had on this litigation. For example, the data contained in the Agrelot memorandum should have prevented Geraghty & Miller, consultants arguably under considerable influence by the Esso Defendants, from stating to the EPA in April of 1991 that there was no evidence of any release from the Esso site "to the environment." *See*, Harris Affidavit at ¶ 26. While Dr. Harris concludes that no reasonable EPA official would have relied on this assertion to release the Esso Defendants from their responsibility for contamination, his conclusion is misleading. If the EPA can not rely on the statements of outside consultants or were required to "guess" which statements were reliable, such consultants would be worthless to the EPA's mission. Further, Dr. Harris does not explain why such a statement by Geraghty & Miller would not have severely damaged the other parties positions with respect to the EPA proceedings requiring, at a minimum, a response to such an assertion.

pose serious health threats to the community.[8] While it is concerned about compliance with its rules and orders in every case, the court must be vigilant in commanding parties to comply where their failure to do so threatens the general public — especially where the public is not a party to the litigation. Viewed in this light, the court finds no alternative but to impose what it considers to be severe sanctions on these parties. In choosing to utilize abusive litigation tactics in the small community of St. Thomas, these parties must expect proportionate sanctions.

 To impose sanctions on the Esso Defendants and their former counsel, the court will rely on its inherent powers because the applicable Federal Rules of Civil Procedure and statutes are inadequate to address the conduct at issue. In circumstances similar to those present here, the Supreme Court has recognized that where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," the court need not apply the Rules and statutes first before invoking its inherent power to sanction. *Chambers*, 501 U.S. at 51. In this case, the Federal Rules of Civil Procedure and the applicable statutes are inadequate for two reasons. First, they fail to encompass all of the bad faith practices engaged in by the Esso Defendants and their former counsel;[9] thus, to address much of that conduct, the court will be forced to rely on its inherent powers. Judicial resources will be saved by avoiding the need to address the Rules and statutes before resorting to its inherent powers to impose the sanctions outlined in the remainder of this opinion. Second, the Rules and statutes do not provide explicitly for sanctions which redress the harm to the St. Thomas community. For these reasons, the court

---

[8] In making this finding, the court does not suggest that the health and welfare of the residents of the St. Thomas community was actually harmed by the sanctionable conduct at issue in this case. The conduct of the Esso Defendants and their former attorneys is sufficient to warrant sanctions even where no one in the surrounding community has been harmed. The purpose of sanctions is not to compensate victims for any losses but to deter the conduct which gives rise to the risk of such harm; thus, actual harm is unnecessary. In this matter, health problems are unlikely to result from the sanctionable conduct given the timing of the closure of all wells pumping from the Tutu Aquifer.

[9] For example, neither the Rules nor the applicable statutes address the issue of increasing the sanctions where, as here, the conduct shows a pattern of conduct designed to delay or impede the development of the environmental science of the case.

finds that it may rely solely on its inherent powers to fashion appropriate sanctions on the Esso Defendants and their former counsel, *Id.* at 44-45.

### C. Nonmonetary Sanctions: The court will impose nonmonetary sanctions only upon the individual lawyers.

Although somewhat limited at this stage in the proceedings, the court has an array of nonmonetary sanctions it could impose against the Esso Defendants and their former counsel. Under the facts in this case, the remaining nonmonetary sanction available against the Esso Defendants — dismissal of their contribution claims under the applicable environmental statute — is inappropriate. However, the individual attorneys will be barred from practicing before this court.

With respect to the Esso Defendants, the Federal Rules of Civil Procedure outline certain nonmonetary sanctions which a court may impose upon a party for violations of its orders or the Rules. Thus, if a party fails to comply with the terms of a scheduling order entered pursuant to Rule 16 or fails to permit discovery, the court may, among other sanctions, strike the party's pleadings or dismiss the action or proceeding or any part thereof. Fed. R. Civ. P. 16(f) and 37(b)(2). Adopting the approach of the Third Circuit, this court has attempted to separate the merits of the underlying litigation from these sanctions proceedings. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984) ("We have repeatedly stated our preference that cases be disposed of on the merits whenever practicable"). For example, during the recent trial of the remaining common law claims in this consolidated matter, the court consistently prevented all parties from introducing evidence which arose out of and was solely concerned with the sanctions proceedings. Because the underlying common law claims have settled, most of the traditional nonmonetary sanctions which the court could have imposed on the Esso Defendants have become moot. *See e.g.*, Fed. R. Civ. P. 37(b)(2).

■ ■ Currently, the only remaining parcel to this litigation which remains outstanding are the parties' various claims under the Comprehensive Environmental Recovery, Compensation, and Liability Act ("CERCLA"). In addition to other parties, the Esso

Defendants have asserted various contribution claims under CERCLA; however, the court finds that dismissal of those claims is not an appropriate sanction. As it suggested previously, the court finds that the dismissal of the CERCLA claims would place a "disproportionate burden" on the Esso Defendants to clean-up the Tutu Aquifer. *Tutu I*, 162 F.R.D. at 76. The Esso Defendants are not alone in their responsibility for contaminating the aquifer; thus, they should not be the only parties held accountable for remediation. To achieve the optimal level of deterrence, the costs of complying with our environmental laws should be applied in proportion to blame. While the court does not doubt that the sanctionable conduct impacted both severely and adversely the proceedings of the EPA, the court is hesitant to award a sanction the effect of which would reward other parties who are themselves violators of our environmental laws. Such sanctions would create a negative incentive among such parties to police their adversaries in hopes of finding discovery violations that could allow them to avoid their responsibilities for environmental contamination. In addition, this sanction would burden disproportionately the Esso Defendants without sufficiently recognizing the responsibility of their team members — the Goldman Antonetti firm and their counsellors. Further, the sanction of dismissal does not allow the court flexibility to take into account any mitigating factors. For example, in this matter, the severity of any sanction must take into account both the role of the Esso Defendants in bringing the nondisclosure of the Agrelot memorandum to the court's attention and their good faith attempts to settle the monetary sanction claims with the Movants. Finally, this conclusion is consistent with the Third Circuit's approach in Poulis because rather than imposing the most severe sanction of dismissal, the court will impose the alternative sanctions outlined later in this opinion. *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984). For these reasons, and consistent with its approach to the common law claims, the court finds that the CERCLA claims of the Esso Defendants should be decided on their merits rather than as a result of a sanction.

With respect to the individual attorneys, courts have historically imposed nonmonetary sanctions upon attorneys pursuant to their

315

inherent powers. As the Third Circuit has recognized, courts have "disbarred, suspended from practice, or reprimanded" attorneys for abuse of judicial process. *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 560 (3d Cir. 1985)[10] (citations omitted); *Titus v. Mercedes Benz of North America*, 695 F.2d 746, 749 n. 6 (3d Cir. 1982). Further, in the Virgin Islands, these inherent powers of the court have been explicitly recognized in the Local Rules of Civil Procedure. In relevant part, Local Rule 83.2 states that:

> (b) The court, in furtherance of its inherent power and respon-
> sibility to supervise the conduct of attorneys who are
> admitted to practice before it or admitted for the purpose of
> a particular proceeding (pro hac vice), promulgates the
> following Rules of Disciplinary Enforcement superseding all
> of its other Rules pertaining to disciplinary enforcement
> heretofore promulgated.
>
> . . .
>
> (4) Standards for Professional Conduct
>
>> (A) For misconduct defined in these Rules and for good
>> cause shown, and after notice and opportunity to be heard,
>> any attorney admitted to practice before this court may be
>> disbarred, suspended from practice before this court, repri-
>> manded or subject to such other disciplinary action as the
>> circumstances may warrant.
>>
>> (B) An act or omission by an attorney admitted to practice
>> before this court, individually or in concert with any other
>> person or persons, which violates the application Rules of
>> Professional Conduct referred to in Rule (a)(1) shall consti-
>> tute misconduct and be grounds for discipline whether or
>> not the act or omission occurred in the course of an
>> attorney-client relationship.

Rule 83.2 of the Local Rules of Civil Procedure of the District Court of the Virgin Islands.

---

[10] Although the legal underpinnings of the Eash opinion are discussed throughout this opinion, the court must also note one unique procedural aspect to that case. In striving to reach its decision on a fully developed record, the Third Circuit appointed an advocate to represent the trial court's findings and legal position. *Eash*, 757 F.2d at 559 n. 1. This approach constitutes an even-handed approach to such a difficult issue.

■ Pursuant to its inherent powers, the court finds that an appropriate nonmonetary sanction to be imposed against attorneys Romero, Cepeda and Torres is to bar them from practice before the District Court of the Virgin Islands. Each of these attorneys was admitted *pro hac vice* to represent the interests of the Esso Defendants in this matter. In representing those interests, these attorneys engaged in bad faith discovery practices which will not be condoned. *Tutu I*, 162 F.R.D. at 79-80. This sanction is appropriate in this matter because it punishes these attorneys for their misconduct in a manner that warns others practicing before this court of the severe penalty awaiting those that engage in such practices and thereby deters such conduct in the future.

To determine the appropriate length of these suspensions, the court will look to both the underlying conduct and the presence of any mitigating factors. During the period that they represented the Esso Defendants, Romero, Cepeda and Torres were responsible for conducting, among other things, the discovery process. The nondisclosure of the Agrelot memorandum, *Tutu I*, 162 F.R.D. at 54-62, in combination with the various other discovery abuses which occurred during the same period, *Tutu I*, 162 F.R.D. at 51-53, leads this court to conclude that these attorneys, in concert with their clients, adopted a litigation strategy designed to frustrate if not exhaust their opponents rather than confront the merits of their case. Such practices will not be tolerated in the Virgin Islands especially where, as here, they could adversely affect public health and safety and the remediation of a scarce natural resource.

■ As equal members of the same team, these attorneys are collectively accountable for these abuses although each attorney may have individually been more or less responsible for a given violation. Only Romero has acknowledged the seriousness of his actions and not sought to evade his responsibility. Not only does he acknowledge that the materiality of the Agrelot memorandum should not have impacted its disclosure or, by implication, whether this court should impose sanctions, Eugenio Romero's Sanction Memorandum Re Prejudice, Materiality and Mitigation Ex. A at ¶ 13 ("Romero Memorandum"), but he further acknowledges that any failure by opposing counsel to recognize the nondisclosure of the Agrelot memorandum prior to 1993 does not

317

excuse his own failures. Romero Memorandum, Ex. A at ¶ 19. Most significantly, Romero concedes that as a result of the sanctions proceedings, the court has correctly concluded that there was inexcusable and, maybe, even willful non-disclosure of a private investigative event and the documents identifying it as such.

Romero Memorandum, Exh. A at ¶ 20 (emphasis added). Although such concessions could never fully address the extent of the egregious conduct in which Romero actively participated, the court believes that Romero's gesture of responsibility for his actions is important at this stage of the sanction proceedings. Such a gesture, large or small, has been conspicuously and regrettably lacking throughout. As an integral member of the Esso Defendants' litigation team, Romero deserves to be punished to the same extent as Cepeda and Torres; however, he alone has acknowledged his shortcomings and thus deserves leniency. For these reasons, the court will bar Jose Cepeda and Francis Torres from practicing before this court for a period of not less than three years and Eugenio Romero for a period of not less than one year, to commence this date.

### D. Monetary Sanctions: In its discretion, the court declines to award substantial monetary sanctions in favor of the Movants and against the Esso Defendants and Goldman Antonetti firm.

With respect to the monetary sanction claims, the Movants request that this court award sanctions falling into the three broad categories that this court outlined previously in *Tutu I*:

■ All the movants['] attorneys' fees and costs incurred in connection with all depositions, discovery motions, hearings and conferences related to the parties attempt to obtain evidence as to releases from and/or presence of chlorinated hydrocarbons on the Esso Tutu Service Station site, [2] investigation costs incurred as a result of the concealment of the documents in the Agrelot Files, and [3] attorneys['] fees and costs incurred in the Fact Finding Hearing in this matter may be capable of recovery by the movants.

*Tutu I*, 162 F.R.D. at 72-73.

As a whole, the claims for monetary sanctions suffer from two shortcomings.[11] First, the majority of the claims are unclear and pose difficult "interpretation" problems for this court. Several of the submissions fail to break down the requested monetary sanction into the applicable categories. By apparently assuming that the court will be awarding sanctions which fall into all three of the identified categories, these parties have placed upon the court the responsibility of reviewing their submissions one line at a time to categorize their request should the court choose to award less than all three categories. Such a process would result in further waste of judicial resources. Even where a Movant has attempted to categorize its request, its submission is often confusing and difficult for the court to follow. Second, although most Movants submitted supporting documentation along with their requests

---

[11] Initially, the Movants directed their monetary sanction requests directly to the Esso Defendants, who on behalf of themselves and their former counsel, reviewed the requests and made payments to four of these Movants. Following the settlement discussions, the Movants then submitted their sanction claims to this court which appear to represent simply their initial claims less any amounts paid by the Esso Defendants. The Movants requests can be summarized as follows:

| Movant | Initial Requests for Sanctions to the Esso Defendants | Payments by the Esso Defendants | Monetary Sanction Claim submitted to the Court |
|---|---|---|---|
| Ramsay Motors | 224,812.53 | 71,188.92 | 153,623.61 |
| L'Henri | 155,683.32 | 31,204.48 | 124,478.84 |
| Vernon Morgan | 143,684.40 | 23,077.16 | 120,607.24 |
| PID/Harthman | 557,023.38 | 45,703.36 | 511,320.02 |
| Texaco | 2,700,687.69 | 0.00 | 2,700,687.69 |
| Western Auto | 527,324.18 | 0.00 | 527,324.18 |
| Four Winds | 77,913.14 | 0.00 | 77,913.14 |
| Laga Defendants | 122,731.52 | 0.00 | 122,731.52 |
| Total | 4,534,053.69 | 171,173.92 | 4,362,879.77 |

(e.g., time sheets or bills for their expert witnesses), few if any of the Movants did so in a way that adequately and efficiently explained to the court how those expenses could be justified as a sanction.[12] While the court does not doubt that the sanctionable conduct has resulted in prejudice to the parties, the submissions do not provide the court with a basis for determining the scope of that prejudice to the individual litigant and hence the extent of any appropriate monetary sanctions. In addition, the court must note its concern that the sanctions proceedings be seen as an opportunity to shift all, or a substantial portion, of the Movants' discovery costs to the Esso Defendants and their former counsel. To the extent that these proceedings were meant to compensate the Movants, the court expected the requests for monetary sanctions only to identify unnecessary costs incurred as a result of the sanctionable conduct, not fees and expenses which would have been expended in any event.

 Under the weight of authority, the court may justifiably decline to conduct the necessary line-by-line analysis of the Movants' requests which this court finds to be too extreme and therefore declines at this time to award monetary sanctions in their favor which fall into the first two categories of sanctions identified above. *Lewis v. Kendrick*, 944 F.2d 949, 958 (1st Cir. 1991) (suggesting that inflated and/or inadequate fee applications place intolerable burdens on the court thereby providing sufficient grounds for denying application); *Thelen Oil Co., Inc. v. Fina Oil & Chemical Co.*, 962 F.2d 821, 824 (8th Cir. 1992) ("it is not inappropriate to deny

---

[12] Of note, Texaco's claim for nearly three million dollars includes various costs related to the Tutu Environmental Investigation Committee ("TEIC") Agreement that Texaco entered into with the Esso Defendants prior to the sanction proceedings. At the June hearing, the court indicated that it would not consider Texaco's claim for recovery of its TEIC related expenses in the sanction proceedings. Contrary to the Esso Defendant's position, however, the court never ruled on the merits of any of Texaco's claims under the TEIC Agreement. June Transcript at 26-29 (stating that in rejecting Texaco's claim, the court was not "making any findings"). Despite the court's explicit direction, Texaco is apparently submitting its TEIC Agreement claims to establish that it has not waived any such claims against the Esso Defendants. While it may be unlikely that Texaco will prevail upon its claim, it should nevertheless have an opportunity to attempt to do so. For these reasons, the court will grant the Esso Defendants' motion to strike Texaco's claim with respect to the TEIC Agreement insofar as the sanction proceedings are concerned. However, the same is without prejudice to Texaco's right to pursue its TEIC claims in an appropriate forum.

fees completely when the fee request is outrageously excessive and unsupported by adequate documentation"); *Sun Publishing Co. Inc. v. Mecklenburg News, Inc.*, 823 F.2d 818, 819 (4th Cir. 1987); *Farris v. Cox*, 508 F. Supp. 222, 227 (6th Cir. 1981); *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980); *cf., Cimador v. Secretary of Health and Human Services*, 645 F.Supp. 1273, 1275 (W.D.Pa. 1986) (relying on *Brown* to eliminate certain excessive claims as "plain profiteering").

[11/13] However, a partial award of attorneys' fees and costs to the Movants for their participation in the sanction proceedings is appropriate. When a court is called upon to investigate charges of sanctionable conduct, each attorney has an obligation to the court to aid in uncovering the truth of such serious allegations without any right to reimbursement. Where sanctionable conduct has occurred, attorneys' fees should be considered. In approaching the amount of any such award, however, the court should avoid creating disincentives. Thus, the court should not simply award whatever fees the participating attorneys request because it would be creating an incentive for those attorneys to spend excessive time on the sanctions proceedings in anticipation of recouping all of their fees. For example, where a party may have several attorneys representing their interests on the merits of the matter, those attorneys need not all become involved with the sanctions proceedings. If counsel for a Movant elected to expend considerable resources to gain a benefit through the sanction proceedings for his or her client, the Movant should not also collect the counsel fees involved in procuring this benefit. Thus, this court finds that a uniform award of attorneys' fees to each Movant is appropriate because such an award will fairly compensate each counsel for participating in the proceedings but avoids a windfall to those attorneys who are requesting fees that are substantially more than average.

What remains for the court to answer is the following question: at what level should the uniform award be set? As a yardstick in making this determination, the court has chosen to base its award of attorneys' fees on the fee request of Nancy D'Anna, Esquire, counsel for third-party defendant L'Henri, Inc. Operating largely as a solo practitioner, Ms. D'Anna attended and participated in every hearing, submitted well-reasoned briefs to this court and

consistently evidenced a thorough understanding of the complex factual and legal issues involved in this case. In combination with billable time expended by a legal assistant, a de minimis amount of time spent by an associate attorney and other related costs, Ms. D'Anna has requested that this court award her fees in the amount of $ 29,521.66 for participation in the sanctions proceedings up to but not including her participation at the November hearing. In support of her request, Ms. D'Anna has submitted clear records of her time which suggest that she not only efficiently used the time of her paralegal to reduce her own billable time but also avoided the unnecessary costs of ordering each arguably relevant deposition or copying various other materials. Further, Ms. D'Anna appears to request reimbursement for her time at the same rate that she was charging her client — a rate which is apparently lower than her normal market rate. In short, Ms. D'Anna's request for attorneys fees is largely unassailable; thus, it provides a good measure of how efficiently other attorneys could have participated meaningfully in the sanctions proceedings without wasting resources.

Using Ms. D'Anna's submissions as the standard, the court will award each Movant attorneys' fees for participation in the sanction proceedings the amount of $30,000. As outlined earlier, eight of the ten Movants have requested an award of attorneys' fees. As members of the same team, the Esso Defendants and their former counsel should bear the burden of these monetary sanctions equally. Thus, the court hereby apportions the sanction of attorneys fees equally among these parties — each will be responsible for paying counsel fees to four Movants. Through negotiations concerning the monetary sanction claims, the Esso Defendants have made payments to four Movants: Ramsay Motors, L'Henri, PID/Harthman and Vernon Morgan.[13] Although they total slightly

---

[13] In response to a request from the court, the Esso Defendants provided an outline of the payments that have been made as a result of the sanction negotiations. To date, the Esso Defendants have paid approximately $ 170,000 to Ramsay, L'Henri, PID/Harthman and Vernon Morgan. While this amount exceeds the ultimate award of counsel fees against them, the Esso Defendants have not been penalized by engaging in that process. In addition to counsel fees, the payments by the Esso Defendants apparently include amounts associated with the prejudice suffered by these Movants as a result of the sanctionable conduct. In determining the severity of the sanctions in this case, the court

more than the court is otherwise awarding under this opinion, the court finds that the payments made by the Esso Defendants through the settlement process completely satisfy their obligation to pay counsel fees. The Esso Defendants are to be commended for meeting their obligations through the negotiation process. In contrast, Goldman Antonetti will be required to make payments consistent with this opinion and accompanying order to Four Winds, the Laga Defendants, Western Auto and Texaco.[14]

In connection with the award of attorneys fees for participating in the sanction proceedings, it is appropriate for the court to mention the extraordinary contribution of two attorneys — John K. Dema, Esquire and Addison J. Meyers, Esquire. In the early stages, the court looked to these two attorneys to take the lead in these proceedings — in effect to oversee the efforts of the Movants to avoid waste and duplication. In accepting this informal appoint-

---

recognizes the good faith efforts made by the Esso Defendants to comply with the court's sanction orders even though they may disagree with them. While the Movants may feel that the Esso Defendants could have been less aggressive in their approach to settling the monetary claims, the initiation of sanction proceedings against a particular party does not require that party to become docile.

[14] As noted earlier in this opinion, sanctions for the severe, bad faith discovery abuse in this matter can be issued pursuant to the court's inherent powers without resort to any other statutory authority. *See, Chambers,* 501 U.S. at 51. However, with respect to Goldman Antonetti, Title 28 U.S.C. § 1927 provides an alternative basis for imposing liability. Adopting the well-reasoned approach by Judge Sweet in *Brignoli v. Balch Hardy & Scheinman, Inc.,* 735 F. Supp. 100 (S.D.N.Y. 1990), the court finds that it may hold Goldman Antonetti vicariously liable for the sanctionable conduct of its lawyers pursuant to § 1927. In addition to the reasons articulated in *Brignoli,* the individual attorneys were undoubtedly aided in their representation of the Esso Defendants by other attorneys employed by the Goldman Antonetti firm who despite their absence from the courtroom must nevertheless fulfill their ethical obligations to the bench and the bar. Where the record discloses sanctionable conduct as extensive as that presented in this matter, the court finds that the law firm must ultimately shoulder its share of responsibility; thus, sanctions should issue under § 1927. *Lightning Lube, Inc. v. Witco Corporation, et al.,* 144 F.R.D. 662, 669 (D.N.J. 1992) (recognizing that sanctions under § 1927 may be imposed against a law firm). Further, the sanctionable conduct here unreasonably and vexatiously multiplied these proceedings thereby warranting an award of counsel fees at least equal to the costs of the sanction proceedings. *In Re Yagman,* 796 F.2d 1165, 1187 (9th Cir. 1986) (confirming the appropriateness of awarding sanctions pursuant to § 1927 where plaintiff's counsel committed a "number of discovery abuses, such as failure to produce"). Because at this juncture, the court is not imposing any additional monetary sanctions in favor of the Movants against the Esso Defendants, the court need not reach the issue of whether such sanctions could be alternatively imposed under § 1927 where the "attorney" involved in the conduct giving rise to liability is the party's in-house counsel and where the party, both through said counsel and other employees or principals, is extensively involved in the litigation.

323

ment, each attorney provided invaluable assistance to their fellow attorneys, their respective clients and this court. While their contributions may not be directly reflected in the ultimate award of fees, such an award, in any amount, was never guaranteed. Instead, each attorney accepted his responsibility in recognition of his obligation to the legal profession. In doing so, they have earned the respect and gratitude of this court.

## E. Alternative Monetary Sanctions: The sanctionable conduct of the Esso Defendants and the Goldman Antonetti firm requires the court to impose alternative monetary sanctions against these parties.

█ In addition to the award of attorneys' fees for participating in the sanction proceedings, the court's prior factual findings in this matter require the court to impose an additional sanction against the Esso Defendants and their former counsel. Having canvassed the literature, both commentary and case law, concerning sanctions, the court has identified few alternatives to the routine monetary sanction of fee shifting. Nevertheless, the court is undeterred from its mission of fashioning an appropriate sanction and is willing to adopt a novel, innovative approach. *See, Chambers,* 501 U.S. at 44-45. Pursuant to its inherent powers, the court has considered both the imposition of a fine on the Esso Defendants and their former counsel and the requirement that each of these parties engage in community service as a result of their conduct in this matter. While the court finds each of these alternatives deficient when employed alone, in combination, these alternatives are promising. Thus, the court will require the Esso Defendants and their former counsel to fund a *community service project* which will benefit the St. Thomas community — the party perhaps most aggrieved by their sanctionable conduct.

### 1. The Imposition of a Fine

█ Pursuant to its inherent powers, this court has the power to sanction the Esso Defendants and their former counsel by requiring them to pay a monetary fine. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258-59, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975) (recognizing the federal courts' ability to impose

inherent power sanctions on parties); *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129, 40 L. Ed. 2d 703, 94 S. Ct. 2157 (1974) (same); *Lockary v. Kayfetz*, 974 F.2d 1166, 1170 (9th Cir. 1992) (recognizing the federal courts' ability to impose inherent power sanctions to the lawyers' firm or employer); *Titus*, 695 F.2d at 749 n. 6 (recognizing the federal courts' ability to impose a fine pursuant to its inherent powers); *Eash*, 757 F.2d at 560-68 (same); *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209-10 (11th Cir. 1985) (same); *Donaldson v. Clark*, 819 F.2d 1551, 1557 n. 6 (11th Cir. 1987) (same); cf., Fed. R. Civ. P. 11(c)(2) (outlining the various sanctions a court may impose upon the attorneys, law firms or parties held to be in violation of the Rule including "directives of a nonmonetary nature, an order to pay a penalty into court, or, . . . an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.").[15] Further, it is well recognized that the court may impose such a sanction without resorting to its powers of contempt. Eash, 757 F.2d at 565-66 *citing Cammer v. United States*, 350 U.S. 399, 408 n. 7, 100 L. Ed. 474, 76 S. Ct. 456 (1956); *Kleiner*, 751 F.2d at 1209 (the court's power to impose appropriate sanctions "springs from a different source than does the power to punish for criminal contempt"); cf., *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 512, 22 L. Ed. 205 (1873) (discussing the sources and scope of a court's power to cite for contempt or disbar attorneys).

As a form of sanction, the imposition of a fine offers several advantages. First, unlike the sanction of dismissal which directs punishment solely to the party, the ability to impose a fine represents a flexible sanctioning tool for courts allowing them to

---

[15] Although the court is relying on its inherent powers to impose sanctions on the Esso Defendants and the Goldman Antonetti firm, the fact that Federal Rule of Civil Procedure 11 would allow the court under the circumstances outlined in that rule to impose fines on these parties strengthens the court's conviction that it may also impose this form of sanction against these parties pursuant to its inherent powers. To find otherwise, the court would be forced to conclude that its inherent powers were more limited than those provided under Rule 11 — a position which runs counter to the Supreme Court's recent teachings in *Chambers*, 501 U.S. at 48-49. Cf., *Link*, 370 U.S. 626, 630, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (rejecting petitioner's argument that the language of the then applicable Rule of Federal Civil Procedure, by negative implication, prohibits the court from dismissing the petitioner's case *sua sponte* for failure to prosecute).

impose sanctions upon both the party and their counsel in proportion to fault. *Cf., Eash,* 757 F.2d at 567 (noting that the imposition of fines as a sanction provides courts with a flexible tool for the "day-to-day enforcement of orderly and expeditious litigation"). Further, the court can administer this method of sanctioning easily. Once the fine itself is imposed, the court should not have to engage in any continuing oversight of its order. Finally, through the imposition of fines, the court generates funds for the United States Treasury.

Nevertheless, the imposition of fines as a sanction is far from perfect. Courts and commentators have criticized fines as both ineffective and unjust. *See, e.g., United States v. Wise,* 370 U.S. 405, 409, 8 L. Ed. 2d 590, 82 S. Ct. 1354 (1962) (noting that fines imposed against corporations under the Sherman Act would become "mere license fees for illegitimate corporate business operations" where the individual corporate personnel were exempt from liability); C. Stone, *Where the Land Ends* at 36-53 (1975) (arguing that corporate fines are inadequate and inefficient as punishment for unwanted conduct). Further, in a thoroughly researched and well-developed article, one commentator has suggested that such shortcomings "impel a search for alternative kinds of sanctions." Brent Fisse, *Reconstructing Corporate Criminal Law: Deterrence, Retribution, Fault, and Sanctions,* 56 S. Cal. L. Rev. 1141, 1216 (1983) (the "Fisse Article").

When applied in the context of sanctions proceedings similar to those at bar, two of the perceived shortcomings of fines become particularly important. As has been evidenced by this case, fines may fail to bring about deterrence where the court sets the amount of the fine without reference to the particular sanctionable conduct at issue or the ability of the sanctionable party to pay the fine.[16] In fact, the Esso Defendants and their former counsel

---

[16] As outlined in the Fisse Article, the effectiveness of fines is also limited by what one commentator has described as the "deterrence trap" phenomenon. The limitation arises when the size of the fine that is necessary to deter effectively is larger than that which a corporation is able to pay. Fisse Article at 1218 *citing* Coffee, *No Soul to Damn: No Body to Kick": An Unscandalized Inquiry in the Problem of Corporate Punishment,* 79 Mich. L. Rev. 386, 390 (1981). While the deterrence trap undoubtedly arises where the fine is set without regard for the financial ability of the violator — as in the case where a uniform

continued to engage in sanctionable conduct in this matter despite the imposition of various fines. This limitation is so severe that Federal Rule of Civil Procedure 11 addresses it explicitly by providing, in pertinent part, that a "sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(2). Further, the Advisory Committee Notes to Rule 11 state that among the factors a court should consider in determining the extent of sanction is the "amount, given the financial resources of the responsible person, needed to deter that person from repetition in the same case" and also "what amount is needed to deter similar activity by other litigants." Fed. R. Civ. P. 11 advisory committee's notes. In addition to their potential to underdeter sanctionable conduct, fines fail to benefit the parties and community affronted by the sanctionable conduct because the sanctioned parties ordinarily pay such fines directly to the federal government.

### 2. An Alternative to Fines — Community Service as a Sanction

As an alternative to imposing a fine, the court finds that pursuant to its inherent powers, it has the authority to craft an innovate sanction tailored to address the particular posture of this case. In *Chambers*, 501 U.S. 32, 115 L. Ed. 2d 27, 111 S. Ct. 2123, the Supreme Court addressed the broad reach of the inherent powers of the federal courts. To explain the genesis of the courts' inherent powers, the Court stated, in relevant part, that:

It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.' *United States v. Hudson*, 11 U.S. 32, 7 Cranch 32, 34, 3 L. Ed. 259 (1812); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980) (citing *Hudson*). For this reason, 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.' *Anderson*

---

penalty is imposed all violators of an environmental contamination statute — courts can avoid this limitation on fines by customizing a fine to the financial ability of the particular sanctionable party.

327

*v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821); *see also Ex parte Robinson*, 86 U.S. 505, 19 Wall. 505, 510, 22 L. Ed. 205 (1874). These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962).

*Chambers*, 501 U.S. at 43 (triple citations omitted). With such broad policies underlying the existence of the courts' inherent powers, it is not surprising that the Third Circuit Court of Appeals recognized much earlier that the concept of what constitutes the appropriate use of inherent powers is an evolving one thereby allowing courts to address effectively the demands placed upon our system of justice. Specifically, in *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 560-69, the Third Circuit upheld the power of a district court to impose a sanction on an attorney in the form of a monetary fine. In doing so, the Third Circuit overruled its prior holding in *Gamble v. Pope & Talbot, Inc.*, 307 F.2d 729 (3d Cir.) *cert. denied*, 371 U.S. 888 (1962), relying, in part, on the dramatic change in the demands facing our courts as a result of the explosion of litigation which has occurred in our country. *Eash*, 757 F.2d at 568. Noting that a "number of courts have rejected the result and reasoning in *Gamble*," the *Eash* Court recognized specifically that a "major factor in the decisions that have refused to follow *Gamble* has been the startling increase in the number and complexity of cases filed in the federal courts." *Id.* at 565. Further supporting the view that the federal courts may rely on their inherent powers as the basis for innovative sanctions, the *Eash* Court stated

> Nevertheless, we do not believe that a long-standing tradition need undergird every particular sanction imposed pursuant to the district court's inherent powers.

*Id.* at 567.

■ In *Chambers*, the Supreme Court embraced implicitly the Third Circuit's concept that the courts' inherent powers to sanction parties and their attorneys must evolve to meet the changing demands on our courts. Specifically, the Court stated that

Because of their very potency, inherent powers must be exercised with restraint and discretion. [*See Roadway Express*, 447 U.S. at 764.] A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. As we recognized in *Roadway Express*, outright dismissal of a lawsuit, which we had upheld in *Link v. Wabash Railroad Co.*, 370 U.S. 626, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962), is a particularly severe sanction, yet is within the court's discretion. 447 U.S. at 765. Consequently, the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well. *Ibid. See also Hutto v. Finney*, 437 U.S. 678, 689 n. 14, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978).

*Chambers*, 501 U.S. at 44-45 (triple citations omitted). Consistent with the Third Circuit's approach in *Eash*, this passage suggests strongly that trial courts, pursuant to their inherent powers, have the flexibility to develop appropriate sanctions to fit both the particular circumstances presented by a case, as well as the operational circumstances facing the court. Although the courts are not limited to only those types of sanctions used previously by other courts, *Eash*, 757 F.2d at 567, they are limited to crafting innovative sanctions which are less severe than the sanction of dismissal. *Chambers*, 501 U.S. at 44-45; *Eash*, 757 F.2d at 567 (upholding monetary sanction against counsel in part because that sanction was "less severe than outright dismissal"); *Kleiner*, 751 F.2d at 1209 ("Since misconduct by a party courts the risk of outright dismissal, lesser sanctions undoubtedly attend the court's inherent power to discipline intentional attorney misconduct of the sort involved in this case."); *cf., Poulis*, 747 F.2d 863-69 (trial court must consider whether alternative sanctions, short of dismissal, would address effectively sanctionable conduct).

Among the myriad possible innovative sanctions, this court considered seriously the imposition of a sanction of community service on the Esso Defendants and their former attorneys.[17]

---

[17]The court also considered imposing a sanction of adverse publicity upon the Esso Defendants and their former counsel. Fisse Article at 1229-30. At least one court has recently done so under circumstances apparently similar to those here. *See, In re E.I. Du Pont de Nemours and Company — Benlate (R) Litigation*, 1995 U.S. Dist. LEXIS 12175, *107,

Community service sanctions offer several advantages over the more routine sanction of fines. *See generally,* Fisse Article at 1226-29. Perhaps most importantly, in stark contrast to fines, community service confers a direct benefit on the parties and/or others affected by sanctionable conduct. Where the harm resulting from the sanctionable conduct falls upon a non-party to the litigation, a community service requirement can be narrowly tailored to address that harm. In addition, community service can require a corporate organization to internalize the costs of the sanction in a manner which inflicts those costs directly on the actors making up that organization rather than shifting them to the shareholders of that organization as a cost of business. In doing so, a sanction of this type creates incentives for greater deterrence — following the imposition of such a sanction, their ordinary responsibilities will include a number of hours working for the community.

Yet, community service requirements are not a panacea in the search for determining appropriate sanctions. In determining whether such a sanction is appropriate in a given case, the court must be mindful of two significant concerns: the often burdensome responsibility of administering the sanction and the opportunity for judges to channel corporate resources into their favorite charities. *See,* Fisse Article at 1227-28. With respect to the latter concern, however, the court agrees with Fisse who has argued that the "capricious judicial allocations of resources could be avoided by requiring that the community service project bear a reasonable relationship to the offense." *Id.* Thus, this method of sanction is valid so long as the court justifies the particular benefactor of the service and the extent of the services required. Nevertheless, the task of administering community service sanctions imposes considerable burdens on a court often in direct proportion to the sanction imposed.[18] Thus, in this case, by imposing a heavy

1995 WL 814579, *38 (M.D.Ga. 1995) (J. Elliott) (imposing a $100,000,000 sanction which could be avoided by publishing a court reviewed statement in the Wall Street Journal).

[18] While Fisse attempts to minimize the burdens of administering this type of sanction, Fisse Article at 1228, the court finds that his attempt at doing so suggests that the court would have to remain continuously involved in such a sanction. *Id.* The court does not suggest that either the Esso Defendants or their former counsel would intentionally engage in the type of "corporate cheating" contemplated in the Fisse Article. In fact, through the actions of their new counsel, the Esso Defendants have conducted themselves through-

sanction of community service to be carried out by personnel of the Esso Defendants and their former counsel, the court could conceivably be required to oversee the efforts of tens, if not hundreds, of individuals over an extended period of time.

### 3. Financial Sponsorship of a Community Service Project

Although each of these alternative sanctions independently presents various weaknesses, the combination of these sanctions in the form of an order to sponsor a community service project offers a promising alternative.[19] Improving upon the sanction of a fine, sponsoring a community service project channels the benefit arising from the sanction back into the community affected by the sanctionable conduct. While it may disagree with the imposition of a sanction, the sanctioned party is provided an opportunity to remediate its own reputation within that community by providing needed service. Further, unlike a community service requirement imposed upon a corporation, sponsoring a community service project dramatically reduces the administration of the sanction by the court and should result in a more efficient use of resources — that is, the community service can be provided by those individuals or parties who specialize in the provision of services of that kind.

Given that it may sanction the Esso Defendants and their former counsel alternatively by imposing a fine or by requiring community service, the court finds that it may sanction these parties by requiring them to sponsor a community service project which benefits the community of St. Thomas as a whole. In fashioning this sanction, the court is aware of the apparent novelty of this method of sanction and the fact that it may not be appropriate in all cases. However, under these facts, such a sanction is appropri-

---

out these difficult proceedings in a manner which strongly suggests otherwise. Given the extraordinarily litigious nature of all of the parties in this matter and the length of the sanction proceedings generally, the court is anxious for closure.

[19] In the context of imposing criminal sanctions against a corporation, Fisse has identified at least two courts that have embraced this hybrid, fine-community service approach. Fisse Article at 1227 *citing United States v. Allied Chemical Corp.*, 420 F. Supp. 122 (E.D.Va. 1976) and *United States v. Olin Corporation*, Criminal No. 78-30, slip op. (D.Conn. June 1, 1978). Apparently, in those cases, the courts imposed a "payment of money for charitable purposes, rather than performance of community service by the corporate offender itself." Fisse Article at 1228.

ate because it is reasonably related to one of the most significant harms resulting from the conduct: the harm suffered by the St. Thomas community. As with all cases giving rise to extended sanction proceedings, the community endured the burden of docket congestion and delay while this court dedicated substantial resources to the sanction proceedings during the past three years. In this matter, these burdens alone were substantial.

In addition to these common burdens, however, the true harm arising from the sanctionable conduct in this matter is one which has rarely been addressed by any of the parties: the impact on the community for the contamination to its most precious resource — naturally occurring fresh water. This impact has two important facets: the harm to the community's health and welfare and the harm to the community for the lost use of its resource. The heart of this matter — whether one focuses on the common law aspects or the CERCLA claims — has always been the contamination of the Tutu Aquifer, arguably the most important source of naturally occurring fresh water on the island of St. Thomas. Thus, in cases similar to this matter, violations of discovery orders for the purpose of delaying, whether temporarily or permanently, the development of the underlying environmental science of the case, directly impacts the potential effect of the contamination on the public.[20] Not only does delay result in harm to public health where recognition of the existence of contamination is slowed, but delay undoubtedly results in the community being deprived of the use of its natural resource. Similar to the impact of the sanctionable conduct on the parties, the court is satisfied that no one will ever know the precise effect that the Esso Defendants or their former counsel visited upon the St. Thomas community by their conduct in this case. The fact that the community has not been represented at any time by counsel in these proceedings suggests that whatever effect the sanctionable conduct would otherwise have on a party, it

---

[20] To clarify, the court does **not** suggest that the Esso Defendants and their former counsel engaged in the sanctionable conduct at issue with the intent to harm to the community of St. Thomas. Rather, the court believes that the Esso Defendants and their former counsel focused on the litigation without appreciating the impact that their conduct may have on the outside community.

has been worse for the community. Thus, the court finds that a sanction which benefits the community is appropriate.

◼ Having established that the sponsorship of a community service project is the appropriate sanction in this matter, the court must now identify the appropriate project. Conceding that the benefit from the service project should, at a minimum, run to the aggrieved individuals, the court rejects the notion that the benefit must specifically address the harm which resulted to those individuals. In this case, the harm to the St. Thomas community was threefold: costs due to delay, potential health costs and the losses arising from the lost use of the aquifer. While identifiable, these costs are not easily remediable. The judicial delay facing litigants during the relevant period can never be cured retroactively. Further, the health risks and extended delay in the use of the aquifer, even if quantifiable, can not be easily addressed by this court. In such cases, rather than attempt to link the service program with the harm suffered by the relevant individuals, this court will seek to impose an economically equivalent alternative — that is, the court will attempt to fashion a sanction which benefits the aggrieved individuals in an amount roughly proportionate to the disutility of the harm they suffered as a result of the sanctionable conduct.

If asked, any citizen of the Virgin Islands could identify a worthy project which could benefit the entire St. Thomas community. Given the reported financial inability of the government, however, only the most pressing issues warrant serious consideration by this court at this time. Having evaluated a variety of projects, the court has identified an appropriate community service project: correction of the unconstitutional conditions and practices existing at the Criminal Justice Complex in St. Thomas.[21]

The Criminal Justice Complex (the "CJC") is located on the third floor of a three story building that formerly housed the central police station and holding cells for sentenced defendants, arrestees

---

[21] The court is thoroughly conversant with the litigation concerning the CJC facility because the matter is pending before it. *Carty, et al. v. Farrelly, et al.*, Civil Action No. 94-78. The "Settlement Agreement" referred to in this opinion was filed in the Office of the Clerk of the Court in St. Thomas under this caption.

and detainees. Currently, the first two floors of the facility are vacant. In June 1994, the National Prison Project of the American Civil Liberties Union Foundation (the "NPP"), in conjunction with local attorney Benjamin A. Currence, Esquire, filed a class action complaint in this court against various officials of the United States Virgin Islands (the "Virgin Islands Officials") challenging the allegedly unconstitutional conditions and practices occurring at the CJC facility. On behalf of the inmates at the facility, the NPP sought a preliminary injunction to relieve the severe overcrowding and to improve the inhumane and unsafe conditions of the inmates' confinement.

As outlined in the complaint, the inmates housed at the CJC face severe living conditions. Critical overcrowding is the most pressing issue facing the CJC facility. In May of 1994, the CJC facility reportedly housed 208 prisoners, 92 of whom were sentenced, in its fifty-one cells; thus, four to five prisoners were confined in any one cell some of whom were apparently required to sleep on mattresses on the floor. Further, the NPP argued persuasively that the effects of such overcrowding were numerous and severe. For example, such overcrowding leads to, among other things, increased noise levels in the cell blocks, an increased risk of the transmission of infectious disease among the prisoners and staff, increased risk of food-borne disease, increased risk of violence among inmates, severe impairment of the ability to maintain the physical plant and serious deterioration of the institutional conditions to the point where basic human needs were being denied. Further, the NPP complained that the conditions existing at the CJC facility raised environmental safety and health concerns, serious fire safety issues and concerns regarding access to physicians and mental health care by the prisoners.

On October 12, 1994, a comprehensive Settlement Agreement (the "Agreement") was entered as the final judgment in this matter. The Agreement requires the Virgin Island Officials to implement a wide range of corrective measures by dates certain beginning with the execution of the Agreement. See, Settlement Agreement at 1-20. Primarily as a result of a complete lack of funding, the Virgin Island Officials have failed to comply with the terms of the Agreement; thus, the inmates continue to suffer these extreme conditions which constitute violations of their civil rights.

■ Having reviewed a variety of potential community service projects for sponsorship by the Esso Defendants and their former counsel, the court finds that focusing the efforts of these parties on remediating the conditions present at the CJC facility is an appropriate project. First, the egregious conditions faced by the inmates, some of whom are being held prior to conviction or sentencing, must become a priority for the St. Thomas community despite its current financial inability to remediate the problems. Thus, by shouldering a substantial portion of this burden, the Esso Defendants and their former counsel will be performing a service which greatly benefits the community harmed by their conduct. In addition, by accepting this sanction in good faith, both the Esso Defendants and their former counsel will be able to demonstrate their continuing commitment to the health and welfare of the St. Thomas community and the administration of justice generally and rehabilitate themselves in the eyes of the general public.

■ To remediate the myriad of problems at the CJC facility requires a multi-pronged approach — a substantial portion of which can be financed by the sanction imposed herein. First, a half-way house for use by the appropriate prison officials is presently under construction, to be funded in part by the sanction and in part by additional monies available to the Virgin Island Officials. When completed, this facility will house certain minimum-security inmates who will live and train for future employment there. Because of its size, the half-way house will absorb a significant number of the inmates currently held in the CJC facility thereby greatly reducing the CJC overcrowding problem. In turn, this newly-freed space at the CJC facility will allow officials there the flexibility of addressing the items to be remediated as set forth in the Settlement Agreement. In addition to the half-way house, the second floor of the CJC facility can be refinished to immediately reduce the overcrowding.[22] These modifications can be accomplished without in any way disturbing the 911 installation which

---

[22] To the extent that the second floor is unavailable to alleviate the overcrowding problem in the CJC facility, any sanction monies allocated to reconstruct this portion of the facility will be applied to the educational and vocational programs referenced above. The court believes that such programs will result in reducing the rate of defendant recidivism.

occupies some part of the second floor of the CJC facility. The latter use will generate federal funds thus providing the CJC with an additional source of income. Further, the financial resources provided through the sanction will be used for reconstruction and maintenance to the third floor of the CJC facility which will further reduce the overcrowding and cleanliness problems currently plaguing the inmates. The sanction money will provide more than just construction funds. It will also provide educational and vocational training programs for inmates to teach them marketable skills for use upon their release. The money will fund a monitor who will work with the court to oversee compliance with the dictates of the Agreement and this opinion and accompanying order. Without delineating the cost of each of the specific parts of the project, the court has received estimates that the total cost of the project outlined above approaches $1,000,000 — an appropriate sum in light of the egregious conduct of the Esso Defendants and their former counsel. Thus, the court will order the Esso Defendants and their former counsel to pay this amount into the court within sixty (60) days of the date of this order.

The court finds this amount to be appropriate for three reasons. First, the sheer scope of the sanctionable conduct engaged in by the Esso Defendants and their former counsel and the attendant harms flowing therefrom demand such a severe sanction. Second, the economic disutility of this sanction — the payment of $1,000,000[23] — is much less than the other nonmonetary sanctions the court could have imposed pursuant to Federal Rules of Civil Procedure. *Chambers*, 501 U.S. at 44-45; *Eash*, 757 F.2d at 567. For example, had the court dismissed the CERCLA claims of the Esso Defendants, the disutility to the Esso Defendants alone would have been dramatically higher than this entire monetary sanction. Third, when appropriately apportioned, the size of this monetary sanction is calibrated to sanction these parties based in part on their ability to pay for their conduct thereby deterring them and others similarly situated from engaging in the type of egregious discovery practices evidenced here. *Cf.* Fed. R. Civ. P. 11(c)(2) ("A sanction

---

[23] This monetary sanction is in addition to the court's directive that the Esso Defendants and their former counsel pay certain attorneys' fees in favor of the Movants as outlined previously in this opinion.

imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated."). Considering both the conduct of the Esso Defendants and their former counsel as well as their respective abilities to pay, the court will order the Esso Defendants to pay $750,000 collectively and the Goldman Antonetti firm to pay $250,000 toward the costs of the $1,000,000 project outlined above.[24]

## III. Conclusion

For the reasons set forth above, the court will enter an order of sanctions against the Esso Defendants and their former counsel consistent with this opinion. By this opinion and accompanying order, this court brings closure to the sanction issue. The court recognizes that all parties will be dissatisfied to some extent with the court's approach to the imposition of sanctions against the Esso Defendants and their former counsel. As is the situation with a hard fought settlement, this dissatisfaction evidences what this court finds to be an equitable, just result.

### ORDER (Sanctions)

Presently before this court is the Order to Show Cause Why the Esso Defendants and their Former Counsel should not have sanctions imposed against them;

Having reviewed the court's previous opinions in this matter, the submissions of the parties and the oral argument presented at several hearings including the hearing in June and November 1995; and

For the reasons stated in the court's opinion of this date;

IT IS on this 19th day of April 1996 hereby;

---

[24] In essence, each of the responsible parties, Esso Standard Oil S.A. Ltd., Esso Virgin Islands, Inc., Esso Standard Oil Co. (Puerto Rico) and the Goldman Antonetti firm must shoulder equal financial responsibility for the community service project. Throughout this matter, these parties have operated as a team. As such, each should bear a similar burden. Although the court believes that each of the Esso Defendants should be responsible for one-third of their collective sanction, the Esso Defendants are free to allocate the fiscal burden of the sanction among themselves as they deem appropriate.

ORDERED that Eugenio Romero, Esquire is barred from the practice of law before this court for a period of one year, to commence from the date of this order; and it is further

ORDERED that Jose Cepeda, Esquire and Francis Torres, Esquire are barred from the practice of law before this court for a period of three years, to commence from the date of this order; and it is further

ORDERED that the monetary payments heretofore made or to be made as provided in the accompanying opinion of this date, as stated below, shall constitute the total amount of monetary sanctions awarded the Movants by the court. Any amounts requested by the Movants in excess of such award are hereby expressly rejected and denied by the court consistent with the terms of that opinion; and it is further

ORDERED that pursuant to the court's inherent powers, the law firm of Goldman Antonetti Cordova & Axtmayer shall pay, consistent with the opinion accompanying this order, the sum of $30,000 as costs of counsel incurred in connection with the sanction proceedings to each of the following four Movants: Four Winds Plaza, Western Auto, the Laga Defendants and Texaco. Said amounts are to be paid within sixty (60) days of the date of this order; and it is further

ORDERED that pursuant to the court's inherent powers, the Esso Defendants and the law firm of Goldman Antonetti Cordova & Axtmayer shall pay to the Clerk of the Court within sixty (60) days of the date of this order the additional sum of $1,000,000 to be apportioned among these parties as follows:

| The Esso Defendants | $750,000 |
| The Goldman Antonetti Firm | $250,000; and it is further |

ORDERED that the sum of $1,000,000 shall be held by the Clerk of this Court in an account designated as the "Community Service Sanction Account" to be utilized in accordance with the accompanying opinion of this date and upon further order of this court; and it is further

ORDERED that in the event of any appeal of this order and accompanying opinion, to the extent that other entities expend monies to address the problems at the CJC facility or to compen-

sate the court-appointed monitor as outlined in the opinion accompanying this order and such appeal is denied, such entities may make an application to the court to be reimbursed for such expenditures from the community service sanction monies; and it is further

ORDERED that Goldman Antonetti's Motion for Reconsideration of this Court's Opinion and Order dated February 15, 1996 is DENIED; and it is further

ORDERED that the Motion by the Esso Defendants to Strike Texaco's Claim is GRANTED, consistent with this court's holding in footnote 12 of the accompanying opinion; and it is further

ORDERED that the Motion by the Goldman Antonetti Firm to Strike Texaco's Claim is DENIED to the extent of counsel fees which the Goldman Antonetti Firm must pay to Texaco in accordance with this order and the accompanying opinion.